**COUNTY OF BERKS and Berks County Prison Board, Petitioners**

v.

**PENNSYLVANIA LABOR RELATIONS BOARD, Respondent.**

Commonwealth Court of Pennsylvania.

Argued May 15, 2013.
Decided Sept. 17, 2013.

Joel S. Barras, Philadelphia, for petitioners.

Warren R. Mowery, Jr., Harrisburg, for respondent.

Claudia G. Lukert, Harrisburg, for intervenor, Pennsylvania Social Services Union, Local 668, Service Employees International Union.

BEFORE: PELLEGRINI, President Judge, and McGINLEY, Judge, and COHN JUBELIRER, Judge, and SIMPSON, Judge, and LEAVITT, Judge, and BROBSON, Judge, and McCULLOUGH, Judge.

OPINION BY Judge COHN JUBELIRER.

 The County of Berks and Berks County Prison Board (together, the County) petition for review of the Final Order of the Pennsylvania Labor Relations Board (PLRB) dismissing the County's exceptions and making final and absolute the Hearing Examiner's Proposed Decision and Order finding that the County committed an unfair labor practice in violation of Section 1201(a)(1) of the Public Employe Relations Act[1] (PERA). In this appeal, the County argues that the PLRB's Final Order denies the County the benefits of its bargain, infringes upon the County's constitutional right to free speech, and fails to conclude that the County established an affirmative defense. Discerning no error, we affirm.

The PLRB summarized the relevant findings as follows:

The County and [Pennsylvania Social Services Union, Local 668, Service Employees International Union (Union)] are parties to a collective bargaining agreement [CBA] that covers the wages, hours and terms and conditions of employment of employes at Berks County prison. On August 1, 2008, the County and the Union entered into a side agreement for an alternative work schedule that allows employes to choose to work a four days a week, ten hours a day schedule (also known as the 4–10 agreement). The 4–10 agreement also provides that "[t]he County has approved a compressed work week program on a trial basis and may revert back to the original 5 day work week at any time with a thirty (30) day notification to the [a]ffected employees."

Caseworkers at the prison are in charge of orienting and completing an intake assessment and classification of every inmate who enters the prison. Four caseworkers, including Karen Arms, requested to have off either Mondays or Fridays under the 4–10 schedule. Because caseworkers employed at the prison preferred to have three-day weekends, the 4–10 schedule caused the work of processing prisoners to back up on Mondays and Tuesdays.

In April 2009, Arms took an extended leave of absence to work directly for the Union. While Arms was on leave, Kevin Neff, the chief shop steward for the Union, and the County met on May 11,

---

1. Act of July 23, 1970, P.L. 563, *as amended*, 43 P.S. § 1101.1201(a)(1). Section 1201(a)(1) provides that "[p]ublic employers, their agents or representatives are prohibited from" ... [i]nterfering, restraining or coercing employes in the exercise of the rights guaranteed in Article IV of this act. *Id.* Article IV states, in relevant part: "[i]t shall be lawful for public employes to organize, form, join or assist in employe organizations or to engage in lawful concerted activities for the purpose of collective bargaining or other mutual aid and protection or to bargain collectively through representatives of their own free choice." Section 401 of PERA, 43 P.S. § 1101.401. In PERA proceedings, it is the complainant alleging an unfair labor practice who bears the burden of proving the unfair labor charge. *Lehighton Area School District v. Pennsylvania Labor Relations Board*, 682 A.2d 439, 442 (Pa.Cmwlth.1996).

2010, and negotiated a modified 4–10 scheduling agreement to assist the County with the problems caused by employes taking off Fridays and Mondays. [The modified agreement required that one caseworker ... switch her day off from Friday to Thursday, and required that an additional caseworker ... "adjust their (sic) Monday off schedule as needed based on substantial operational needs, as it applies to the Work Release Coordinator position."] The modified 4–10 agreement preserved the parties' contractual rights contained in the collective bargaining agreement and the original 4–10 agreement.

Later in 2010, Arms informed the prison that she would return from her extended leave. Initially, upon her return, Arms worked the five day schedule, eight hours a day. Arms was entitled under the [collective bargaining agreement] to return to the schedule she was on when she took extended leave, and asked to return to the 4–10 schedule, which request the County granted.

On or about October 20, 2010, Christina Parish, Arms' supervisor, informed Neff, the chief shop steward, that Arms would have to switch her day off to Tuesday, Wednesday or Thursday or the County will give the Union thirty days['] notice to end the 4–10 schedule for all bargaining unit employes. Parish admitted to Arms that she has made that statement to Neff. Arms decided to agree to return to the five day schedule out of fear that if she did not do so the 4–10 schedule would be taken from the rest of the bargaining unit.

(Final Order at 1–2 & n.1 (citations and footnote omitted).)

The Union filed a charge of unfair labor practices with the PLRB. It alleged that the County "coerced Karen Arms to change her hours of work established by the collective bargaining agreement under the threat of her coworkers losing their long established work schedules and thus violate[d] [PERA]." (Charge of Unfair Labor Practice(s), Specification of Charges ¶ 21, R.R. at 7a.) The Secretary of the PLRB issued a complaint and notice of hearing. (Complaint and Notice of Hearing, R.R. at 2a–3a.) Thereafter, a Hearing Examiner held a hearing at which the County and the Union presented witness testimony and submitted documentary evidence. Both parties then submitted post-hearing briefs. After the close of the record and submission of briefs, the Hearing Examiner issued a Proposed Decision and Order.

The Hearing Examiner credited Arms' testimony regarding the statement made by Parish and found that the County coerced Arms into making the schedule change. (Proposed Decision and Order at 4.) He rejected the County's suggested interpretation of the facts, and the County's argument that staffing concerns outweighed any possible interference with Arms' rights. (Proposed Decision and Order at 4.) As a result, the Hearing Examiner determined the County committed an unfair labor practice by threatening Arms that if she chose to work the contractually provided alternate work schedule, the County would eliminate the program for the entire bargaining unit. (Proposed Decision and Order at 5.) Thus, the Hearing Examiner determined the County violated Section 1201(a)(1) of PERA. (Proposed Decision and Order, Conclusions of Law ¶ 4.)

The County filed exceptions with the PLRB, challenging the Hearing Examiner's Proposed Decision and Order. The County argued that the Hearing Examiner erred in finding a violation of Section 1201(a)(1) "where the County had stated business concerns for its desire to elimi-

nate the 4–10 schedule, and [it] had a contractual right to end the program on thirty days['] notice to the Union." (Final Order at 2.)

The PLRB issued a Final Order in which it dismissed the County's exceptions, and made the Hearing Examiner's Proposed Decision and Order absolute and final. Based upon the totality of the circumstances, the PLRB determined that, "the Hearing Examiner did not err in finding that the County's threat to eliminate the 4–10 scheduling agreement had a tendency to coerce employes in the exercise of the protected act of asserting their contractual rights." (Final Order at 3.) The PLRB concluded that:

> Here, for over a year, Arms' caseworker position remained vacant as she did not work for the County, and thus did not work Mondays. Indeed, since Arms began her leave from the County in April, 2009 to work for the Union, which encompassed both before and after the May 11, 2010 modified 4–10 agreement, the County had four employes scheduled to work on Mondays. Notably, before going back to her 4–10 schedule with Mondays off, Arms asked Parish if there were any foreseeable scheduling problems. In response, Parish did not identify any potential issues. Arms and Parish continued to discuss Arms' return to her 4–10 schedule several times, and mutually agreed on a date for Arms to return to her schedule with Mondays off. After Arms returned to her previous 4–10 schedule with Mondays off, the County continued, as before, to have four caseworkers scheduled for Mondays.

Moreover, Arms testified that since her return to the County in late 2010, she was assigned duties in the community reentry center (CRC), not as an intake caseworker, and that Mondays were not busy for her. It is undisputed that the County's alleged concerns about the backlog are with the intake caseworkers, not counselors, such as Arms' assignment at the CRC.

> Despite numerous advance opportunities to discuss Arms' return to her 4–10 schedule and any corollary scheduling concerns, it was not until after Arms, then a counselor at CRC, exercised her contractual right to return to her 4–10 schedule with Mondays off that the County threatened to eliminate the 4–10 scheduling option for all bargaining unit employes because of alleged issues of staffing with intake caseworkers. To a reasonably objective employe, it would appear that the County's threat to eliminate the 4–10 scheduling was not out of a concern over staffing, but in response to Arms' exercise of her contractual right to return to her 4–10 schedule. The message sent to the employes by the County's actions is that exercise of contractual rights may result in similar threats or unilateral actions to eliminate those contractual rights.

(Final Order at 2–3 (footnotes and citations omitted).) The County now petitions this Court for review.[2]

█ Initially, we note that in reviewing a PLRB determination under PERA, our Court has "recognize[d] that the 'PLRB possesses administrative expertise in the area of public employee labor relations and should be shown deference'" and that this

---

2. "[W]hen reviewing a decision of the [PLRB], our review is limited to determining whether there has been a violation of constitutional rights, an error of law, [a] procedural irregularity, or whether the findings of the

agency are supported by substantial evidence." *Borough of Ellwood City v. Pennsylvania Labor Relations Board*, 606 Pa. 356, 365, 998 A.2d 589, 594 (2010) (citations omitted).

" 'Court will not lightly substitute its judgment for that of the PLRB.' " *Lehighton Area School District v. Pennsylvania Labor Relations Board,* 682 A.2d 439, 442 (Pa.Cmwlth.1996) (quoting *American Federation of State, County, and Municipal Employees, Council 13 v. Pennsylvania Labor Relations Board,* 150 Pa.Cmwlth. 642, 616 A.2d 135, 137 (1992)). "It is within the province of the PLRB to weigh conflicting evidence, make appropriate credibility determinations, resolve primary issues of fact and draw reasonable inferences from the established facts and circumstances." *Id.* This Court must uphold the PLRB's decision "if its factual findings are supported by substantial evidence." *Allegheny County Deputy Sheriffs' Association v. Pennsylvania Labor Relations Board,* 615 Pa. 126, 131, 41 A.3d 839, 843 (2012). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Delaware County Lodge No. 27, Fraternal Order of Police v. Pennsylvania Labor Relations Board,* 694 A.2d 1142, 1145 n. 5 (Pa.Cmwlth.1997).

■ In support of its appeal, the County first argues that the PLRB erred in concluding that the County's legitimate exercise of its constitutional, statutory and contractual rights constituted a violation of Section 1201(a)(1) of PERA. It asserts this result contravenes both the clear statutory language and the underlying intent of PERA. The County contends the PLRB concluded that the County properly negotiated an agreement with the Union that modified employee schedules and expressly authorized the County to revert back to the original scheduling model at the County's sole discretion. Moreover, it argues, the PLRB recognized that the agreement obligated the County to notify affected employees of its decision to revert back to the original scheduling model 30 days prior to the change. Nevertheless, the County maintains, the PLRB improperly concluded that the County's fulfillment of this contractual requirement of notifying an affected employee of its decision to return to the original schedule constituted an unfair labor practice. It argues that this result denies the County the benefit of its bargain and creates instability in the bargaining relationship between the County and the Union by failing to enforce the parties' agreements.

Although the County argues that the PLRB's Final Order restricts its ability to manage and control its prison staff and denies the County the benefit of its bargain with the Union, the PLRB's Final Order is not as far-reaching as the County suggests. The Final Order simply prohibits the County from coercing or threatening employees in response to their exercise of protected acts. The Final Order in no way infringes upon the County's alleged right to terminate the 4–10 agreement in accordance with the terms bargained for with the Union.

Next, the County asserts that the PLRB's Final Order infringes on the County's constitutional free speech rights, which federal and state courts, as well as the PLRB, have long recognized. The County contends that an employer's freedom to communicate its views to its employees may only be restricted by the requirement that any predictions "be carefully phrased on the basis of objective fact." *National Labor Relations Board v. Gissel Packing Co.,* 395 U.S. 575, 618, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). The County argues that it made a carefully phrased prediction based on an objective fact when Parish, Arms' supervisor, informed the Union steward that Arms would have to switch her day off or the County would give the Union thirty days' notice to end the 4–10 sched-

ule. The County contends that this prediction was made in the context of its longstanding and legitimate scheduling concerns regarding significant delays in processing inmates. The County asserts it was left with no contractually permitted alternative but to terminate the 4–10 schedule when Arms insisted on taking Mondays or Fridays off from work.

The County contends further that there are no allegations, let alone findings of fact, that the County's communications were false or improvidently phrased. Rather, legitimate operational concerns over the delay in processing inmates that were communicated to the Union on numerous prior occasions necessitated the County's actions. Further, the County offered to continue to negotiate with the Union to seek an alternative resolution during the required notice period. The County contends that repeating these concerns to the Union and to an employee who previously served on the Union's bargaining committee remained well within the ambit of an employer's permitted and protected speech. Therefore, the County argues, Parish's statement to the Union constituted constitutionally protected speech under the totality of the circumstances presented here and the standard set forth in *Gissel Packing*.

As noted above, Section 1201(a)(1) of PERA provides that "[p]ublic employers, their agents or representatives are prohibited from ... [i]nterfering, restraining or coercing employes in the exercise of the rights guaranteed in Article IV of this act." 43 P.S. § 1101.1201(a)(1). In turn, Article IV states, in relevant part: "[i]t shall be lawful for public employes to organize, form, join or assist in employe organizations or to engage in lawful concerted activities for the purpose of collective bargaining or other mutual aid and protection or to bargain collectively through repre-sentatives of their own free choice...." 43 P.S. § 1101.401. There is no dispute in this matter that Arms' exercise of the contractual right to return to her 4–10 schedule is a protected activity for purposes of Section 1201(a)(1) of PERA.

The County is correct that an "employer has a First Amendment right under the Constitution of the United States to communicate [its] general views to [its] employees." *Pennsylvania Labor Relations Board v. Stairways, Inc.*, 56 Pa.Cmwlth. 462, 425 A.2d 1172, 1175 (1981) (citing *Gissel Packing* ). "The expression of the employer's views, however, should include no actual or veiled threat of reprisal or benefit to the employees." *Id.* As stated by the U.S. Supreme Court in *Gissel Packing:*

> [A]n employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union, so long as the communications do not contain a "threat of reprisal or force or promise of benefit." He may even make a prediction as to the precise effects he believes unionization will have on his company. In such a case, however, the prediction must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control.... If there is any implication that an employer may or may not take action solely on his own initiative for reasons unrelated to economic necessities and known only to him, the statement is no longer a reasonable prediction based on available facts but a threat of retaliation based on misrepresentation and coercion, and as such without the protection of the First Amendment....
>
> [The employer in *Gissel Packing* ] argues that the line between so-called permitted predictions and proscribed

threats is too vague to stand up under traditional First Amendment analysis and that the [National Labor Relations Board's (NLRB)] discretion to curtail free speech rights is correspondingly too uncontrolled. It is true that a reviewing court must recognize the [NLRB's] competence in the first instance to judge the impact of utterances made in the context of the employer-employee relationship. But an employer, who has control over that relationship and therefore knows it best, cannot be heard to complain that he is without an adequate guide for his behavior. He can easily make his views known without engaging in "'brinkmanship' when it becomes all too easy to 'overstep and tumble [over] the brink.'" At the least he can avoid coercive speech simply by avoiding conscious overstatements he has reason to believe will mislead his employees.

*Id.* at 618, 620, 89 S.Ct. 1918 (citations omitted) (quoting *Wausau Steel Corp. v. National Labor Relations Board,* 377 F.2d 369, 372 (7th Cir.1967)) (alteration in original).

Here, the PLRB did not find the statement at issue was merely a recitation of demonstrably probable consequences beyond the County's control. Rather, it determined that the County's statement was not made "out of a concern over staffing, but in response to Arms' exercise of her contractual right to return to her 4–10 schedule." (Final Order at 3.) Therefore, to properly determine whether the County's communication was protected free speech, we must first determine whether the PLRB's findings are supported by substantial evidence, which necessitates a review of the testimony presented to the PLRB.

Parish testified that it is the responsibility of the County's caseworkers to process new prisoners arriving at the County's prison and that Monday is the busiest day of the week for caseworkers because prisoners arriving over the weekend must be processed on Monday. (Hr'g Tr. at 77, 85–86, R.R. at 35a, 37a–38a.) The most common days that caseworkers ask to take off are Mondays and Fridays, and Parish permits up to two caseworkers to take the same vacation day off at a time. (Hr'g Tr. at 87, R.R. at 38a.) The prison needs five caseworkers to work on Monday in order to adequately process the prisoners. (Hr'g Tr. at 88, R.R. at 38a.) Parish stated that, after the 4–10 program was implemented, she lost a caseworker on Monday and Friday. (Hr'g Tr. at 91, R.R. at 39a.) When Arms left the County to accept a position with the Union, Arms was working under the 4–10 schedule with Monday off and her departure created a caseworker vacancy on Friday. (Hr'g Tr. at 92, R.R. at 39a.) Parish stated that this created an operational concern and that she eventually brought her concerns to the attention of the Union. (Hr'g Tr. at 92–93, R.R. at 39a.) Parish notified Neff, the Union steward, that the County no longer wanted employees working under the 4–10 schedule, but the County would compromise to continue the program because the staff liked the program; however, the County did not want anyone else to be able to opt into the program. (Hr'g Tr. at 93–94, R.R. at 39a–40a.) Parish testified that the County and the Union then entered into the May 2010 agreement, whereby one caseworker working under the 4–10 schedule moved her day off from Friday to Thursday. (Hr'g Tr. at 94, R.R. at 40a.) Parish stated that the County had five caseworkers at the time the May 2010 agreement was negotiated. (Hr'g Tr. at 94, R.R. at 40a.)

Parish testified further that, when Arms returned to County employment, she initially worked five days a week; however,

Arms eventually requested to return to the 4–10 work schedule with Mondays off. (Hr'g Tr. at 96–97, R.R. at 40a.) Parish allowed Arms to return to the 4–10 work schedule because Parish believed that Arms had a right to return to that schedule pursuant to the collective bargaining agreement. (Hr'g Tr. at 99, R.R. at 41a.) Parish believed that Arms' return to the 4–10 schedule was going to, again, cause operational concerns with regard to the caseworkers because Arms would be off on Mondays. (Hr'g Tr. at 100, R.R. at 41a.) Parish informed the Union that, if Arms returned to the 4–10 agreement, the May 2010 agreement would no longer be valid. (Hr'g Tr. at 100–101, R.R. at 41a.) Parish testified that the Union had agreed in May 2010 that certain employees would not take Mondays or Fridays off and that arms, return was not a consideration when this agreement was negotiated because Parish believed Arms would not be returning to employment with the County. (Hr'g Tr. at 101–102, R.R. at 41a–42a.) Parish testified that Arms did return to the 4–10 schedule for three weeks, but then was taken off that schedule in November 2010 after Parish was informed that Arms voluntarily removed herself from the 4–10 program. (Hr'g Tr. at 102, R.R. at 42a.) Finally, when questioned as to whether she informed anyone at the Union that the County would cancel the 4–10 work schedule if the County could not resolve the Monday staffing issues, Parish testified that she did not believe her "words would've been that we would've cancelled the 4–10 program, but *it would've been probably perceived that way.*" (Hr'g Tr. at 103, R.R. at 42a.) (emphasis added).

Jessica Weaknecht, the County's human resources manager, testified that Parish contacted her in October 2010 and stated that Arms' return to the 4–10 schedule was causing operational concerns with regard to caseworkers not being available to work on Mondays. (Hr'g Tr. at 124, R.R. at 47a.) Weaknecht contacted Neff, the Union steward, to arrange a compromise so that Arms could continue on the 4–10 schedule. (Hr'g Tr. at 124, R.R. at 47a.) Weaknecht testified that, because the Union did not seem interested in having Arms choose another day off, Weaknecht officially put the Union on notice by orally notifying Neff on November 3, 2010, that the 4–10 program would be terminated if a compromise could not be reached. (Hr'g Tr. at 124–25, 127 R.R. at 47a.) Weaknecht testified that Arms then agreed to remove herself from the 4–10 program so that the program could continue for the other employees. (Hr'g Tr. at 126, R.R. at 48a.) Weaknecht acknowledged that Arms was dissatisfied with her removal from the 4–10 program and that Arms filed a grievance in response to her removal. (Hr'g Tr. at 133–35, R.R. at 49a–50a.)

Arms testified that, prior to her return to work for the County, she discussed her work schedule with Parish and it was agreed that Arms would initially work five days a week and then return to the 4–10 schedule. (Hr'g Tr. at 20–21, R.R. at 21a.) Arms testified that she asked Parish in May 2010 whether there would be any issues with her return to the 4–10 schedule and Parish did not specifically alert Arms to any concerns. (Hr'g Tr. at 20–21, R.R. at 21a.) Arms testified further that, after a discussion with Parish, it was agreed that Arms would return to the 4–10 schedule at the beginning of October 2010. (Hr'g Tr. at 22, R.R. at 22a.) Arms was then informed on October 20, 2010 by Neff, the Union steward, that the 4–10 program would be eliminated for all bargaining unit members if Arms did not give up her 4–10 schedule. (Hr'g Tr. at 23, R.R. at 22a.) Arms testified that, when she asked Parish directly if she had informed Neff that if Arms did not give up the 4–10 schedule she would remove all

members from that schedule, Parish responded in the affirmative. (Hr'g Tr. at 24, R.R. at 22a.) Arms testified that Parish advised her to use the grievance procedure if she believed that the County did not have the right to change Arms' schedule arbitrarily. (Hr'g Tr. at 24, R.R. at 22a.)

Arms testified further that she contacted human resources and began an ongoing discussion regarding her possible removal from the 4–10 schedule; however, before a resolution could be reached, she was involuntarily removed from the 4–10 schedule without notice. (Hr'g Tr. at 24–25, R.R. at 22a.) Arms testified that she also had discussions with her supervisor regarding her schedule at the CRC center, that she initially worked at the CRC center for twenty hours per week, and that she had been working forty hours per week at the CRC center since February 2011. (Hr'g Tr. at 28, R.R. at 23 a.) Arms' work at the CRC center has no impact on a caseworker's duties because counselors and caseworkers do not cover for each other. (Hr'g Tr. at 28–29, R.R. at 23a.) Arms stated that the County was still short a caseworker and that the County was in the hiring process. (Hr'g Tr. at 29, R.R. at 23a.) Finally, Arms asked the County to reconsider permitting her to work under the 4–10 schedule when she moved to the CRC because Mondays were her least busy day; however, she remained on a five day a week schedule. (Hr'g Tr. at 29, R.R. at 23a.)

The PLRB credited Arms' testimony, found based upon the totality of the circumstances that Parish's statement was coercive, and rejected the County's testimony which purported to show that long-standing staffing concerns drove Parish to threaten to eliminate the 4–10 program for all employees if Arms did not change her day off. The record shows that the County functioned without Arms working on Mondays or Fridays, due to her leave from County employment, for over a year without hiring another caseworker to replace her. Based on credited testimony, when Arms did return to County employment, she did not work exclusively as a caseworker, but also worked as a counselor in the CRC center. In addition, we note that Parish did not address any concerns with Arms or the Union steward regarding Arms' return to the 4–10 schedule before or after Arms returned to County employment. It was not until after Arms exercised her right to return to that schedule that Parish approached the Union. Moreover, Parish admitted that her words to the Union steward could have been perceived as the County stating that it would cancel the 4–10 program if the alleged Monday staffing issue could not be resolved by Arms switching her day off. Thus, there is substantial evidence to support the PLRB's finding that, "to a reasonably objective employee, it would appear that the County's threat to eliminate the 4–10 scheduling was not out of a concern over staffing, but rather in response to Arms' exercise of her contractual right to return to the 4–10 schedule."[3] (Final Order at 3.) The PLRB possesses administra-

---

**3.** In concluding that there is no substantial evidence in the record to support the PLRB's findings, the dissent states that Arms' position in the CRC center was not relevant because it did not become a full-time position until February 2011 and, therefore, is irrelevant to what occurred in October 2010. *County of Berks*, 79 A.3d at 20–21 (Leavitt, J. dissenting). However, while Arms did not begin to work at the CRC center on a full-time basis until February 2011, the fact that Arms was transferred from her position as an intake caseworker, initially at twenty hours per week, *after* her schedule was changed undercuts the County's assertion that the schedule change was to ensure proper caseworker coverage on Mondays and to address operational concerns. Arms' transfer left the County in

tive expertise in the area of public employee labor relations to which this Court must defer; therefore, it is the agency with the competence "to judge the impact of utterances made in the context of the employer-employee relationship." *Gissel Packing*, 395 U.S. at 620, 89 S.Ct. 1918.[4] As such, given the PLRB's credibility determinations and findings, and Parish's own testimony, we cannot find, contrary to the PLRB, that the County's communication was not a threat, but an objective prediction made in the context of its longstanding and legitimate scheduling concerns and resulting significant delays in processing inmates. Accordingly, the PLRB's Final Order did not place an unconstitutional restriction on the County's free speech rights.

Finally, the County maintains, assuming for the sake of argument that the PLRB properly concluded that the County's communication was sufficient to establish a *prima facie* Section 1201(a)(1) violation,

the PLRB erred in failing to conclude that the County established an affirmative defense. Specifically, the County argues that it possessed a legitimate, overriding operational reason for its action that justified any purported coercion. The County argues it established that the new scheduling model created genuine and unacceptable delays in processing inmates. The County further asserts it established its contractual right to revert back to the original scheduling model. Therefore, even if informing a County employee of the County's decision to exercise its contractual rights interfered with the employee's protected activities, the County contends that such interference does not rise to the level of an unfair labor practice. As such, the County believes that this Court should reverse the PLRB's Final Order and conclude that the County did not violate Section 1201(a)(1) of PERA.[5]

As stated previously, in its analysis, the PLRB considered the totality of the cir-

the same position as it was prior to Arms returning to the 5–8 schedule, which they argue was short a caseworker on Monday. The dissent also asserts that Arms testified that, when she discussed returning to the 4–10 schedule, the County informed her that it had concerns about the prison being adequately staffed on Mondays. *Id.* at 21. This assertion is based on Arms' statement that Parish asked her if she "wouldn't rather have Wednesdays off," and laughed when Arms said that would not work with Arms' schedule. (Hr'g Tr. at 21, R.R. at 21a.) The inference that this statement communicated a fear about the adequacy of prison staffing is a leap, particularly where Arms credibly testified that when she discussed returning to her 4–10 schedule with Parish and asked if there would be any problems, Parish did not specify any concerns about staffing adequacy. (Hr'g Tr. at 20–21, R.R. at 21a.)

4. The dissent concludes that the PLRB's expertise is irrelevant to determining whether Parish's statement was a threat and that this Court need not "bow" to the PLRB's finding that the County threatened Arms because

"[t]he experience of living life and dealing with people is all that is required to discern the difference between a factual statement and a threat." *County of Berks*, 79 A.3d at 21 (Leavitt, J. dissenting). However, as recognized by the U.S. Supreme Court, the administrative agency with expertise in public employee relations law is the agency with the competence "to judge the impact of utterances made in the context of the employer-employee relationship." *Gissel Packing*, 395 U.S. at 620, 89 S.Ct. 1918. A statement that may not seem like a threat in the greater community could have a different and distinct threatening meaning when viewed through the prism of public employee relations, which is why this Court defers to the PLRB's interpretations in these matters.

5. The County relies on two proposed hearing examiner decisions in support of its argument that it established an affirmative defense here. However, proposed decisions are not binding on this Court. *Lancaster County v. Pennsylvania Labor Relations Board*, 62 A.3d 469, 474, n. 10 (Pa.Cmwlth.2013).

cumstances to determine if the County's actions, in light of its purported business concerns, would nonetheless appear to a reasonable employee as interfering or coercing employees from engaging in protected activities. Ultimately, the PLRB determined that the County's statement that it would eliminate the 4–10 program was the product of coercion rather than a credible, legitimate, non-discriminatory business reason. There was no credited evidence that Arms was processing inmates on Mondays when she requested to work the 4–10 schedule or after she had to give up her right to do so. Instead, the credited evidence shows that she was assigned to work as a counselor at the CRC and Mondays were her least busy days. (Hr'g Tr. at 29, R.R. at 23a.) Thus, the PLRB's decision did not credit that the reason for interfering with Arms' protected right was a legitimate scheduling concern. (Final Order at 2–3.) If the County had proven that Arms' change of schedule created unacceptable delays in processing inmates, this would be a different case.[6] However, the County did not and, given the credible facts, we conclude that the PLRB did not err in finding that the County committed an unfair labor practice in violation of Section 1201(a) of the PERA.

Accordingly, for the foregoing reasons, the PLRB's Final Order is affirmed.

### ORDER

**NOW,** September 17, 2013, the Final Order of the Pennsylvania Labor Relations Board entered in the above-captioned matter is **AFFIRMED.**

### DISSENTING OPINION BY Judge LEAVITT.

Respectfully, I dissent. The evidence shows that the County of Berks spoke factually to Karen Arms and the Union about its staffing needs, and there is no evidence that the facts were delivered in a threatening manner. The majority invokes the Pennsylvania Labor Relations Board's "expertise," but this expertise cannot overcome a lack of substantial evidence to support the Board's finding that the County "threatened" Karen Arms.

The County agreed to an alternative work schedule by which caseworkers who did intake at the County prison could work ten hours, four days a week. The County made this accommodation in 2008 on a trial basis to help employees deal with rising fuel costs. The agreement between the County and the Union specifically stated that the County

> approved a compressed work week program *on a trial basis* and may revert back to the original 5 day work week at any time *with a thirty (30) day notification to the [a]ffected employees.*

Board Adjudication at 1; Reproduced Record at 201a (R.R. ——) (emphasis added).

Thereafter, staffing problems developed because, understandably, intake caseworkers preferred to have their day off fall on a Monday or Friday. This caused the prison to experience unacceptable delays in processing inmates, a task that had to be

---

6. The dissent questions what the County was left to do to address the operational concerns it claimed were the reason for "requesting" that Arms switch her schedule. *County of Berks*, 79 A.3d at 21–22, (Leavitt, J. dissenting). The dissent concludes that the Parish's statement to the Union steward was the thirty-day's notice which the agreement provides

the County could give to end the 4–10 program for its affected employees. *Id.* at 21. However, the problem with relying on Parish's statement is that it was made in the context of requiring one Union member, Arms, to give up her right to return to her prior 4–10 schedule, in order to avoid the County's cancelling the entire 4–10 program.

completed in 48 hours because inmates are held in quarantine until their prison assignment is made. The County concluded that it needed five caseworkers on Monday to deal with the weekend backlog. Instead of discontinuing the trial 4–10 program, the County negotiated a modification with Pennsylvania Social Services Union to address this staffing issue. Karen Arms was not included in the modified agreement because she was on an indefinite leave of absence at the time the modification was finalized in May of 2010.

Arms' supervisor, Christa Parish, testified at the Labor Board hearing that Arms used her leave to take a job with the Union, which was expected to become permanent. Believing that Arms was not going to return, the County began to look for a replacement who would work eight hours a day, Monday through Friday. This would bring the complement of intake caseworkers to five on Mondays, assuring adequate coverage for the weekend backlog.

However, before the replacement was hired, Arms announced that she was returning to her prior job with the County. The hiring process stopped. When Arms returned to work in the summer of 2010, Arms chose to work Monday through Friday. This schedule fit the County's scheduling needs.

Several months later, in October 2010, Arms announced that she wanted to return to a 4–10 schedule, taking Mondays off. Arms discussed this with Parish, who suggested that Arms take Wednesdays off instead of Mondays. Arms declined.

Notes of Testimony, May 18, 2011, at 21 (N.T. ——); R.R. 21a. Parish then spoke to the Union steward and advised him that unless Arms switched her day off, there would be a staffing problem for the intake caseworkers. R.R. 87a.[1]

Jessica Weaknecht, the County's human resources manager, also testified at the hearing. She explained that she sought a compromise with the Union steward, but the response was negative. At that point, Weaknecht put the Union on notice, in accordance with the agreement, that the County was going to end the 4–10 program if a compromise could not be reached. Arms then announced that she would return to working a five-day week.

The complainant bears the burden of proving an unfair labor practice. *Pennsylvania Labor Relations Board v. Stairways, Inc.*, 56 Pa.Cmwlth. 462, 425 A.2d 1172, 1174 (1981). The United States Supreme Court has held that an employer enjoys a first amendment right to communicate its views to its employees, which is not to be infringed upon unless the employer makes threats of retaliation, coercion or misrepresentation. *National Labor Relations Board v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). Arms did not meet her burden of proof.

The Board, which did not make an express credibility finding, apparently did not find Parish and Weaknecht credible. It stated that

> it would appear that *the County's threat* to eliminate the 4–10 scheduling *was not out of a concern over staffing,* but in

---

1. The majority states that Parish admitted that her words to the Union steward could have been perceived as a threat. This is not accurate. Parish testified that she did not believe she specifically stated to the Union steward that the County would cancel the 4–10 program. Parish merely acknowledged that her words may have been perceived as meaning that the 4–10 program could be cancelled. N.T. 103; R.R. 42a. Notably, in her testimony before the Board, Parish did not recount her exact words to the Union steward.

response to Arms' exercise of her contractual right to return to her 4–10 schedule.

Board Adjudication at 3; R.R. 203a (footnote omitted) (emphasis added). Notably, a negative credibility finding does not constitute positive evidence that can support a finding of fact. *Yi v. State Board of Veterinary Medicine*, 960 A.2d 864, 874–75 (Pa. Cmwlth.2008). Stated otherwise, not believing the County's explanation on why it asked Arms to take Wednesday off, as opposed to Monday, is not substantial evidence that the County's actions in October of 2010 were the result of an anti-union *animus*.

The Board discredited the County's explanation that it had a genuine staffing problem, finding it merely pretextual. In so holding, the Board reasoned as follows: (1) Arms returned to work in the community reentry center (CRC), not as an intake caseworker, where Mondays were not busy; (2) the County did not identify any problems about Arms returning to her former 4–10 schedule until after she exercised her right to make the change; and (3) Parish had the same number of caseworkers scheduled to work Mondays after Arms took the 4–10 schedule as while Arms was on leave. These reasons are not supported by the evidence.

First, Arms testified that she was working in the CRC as of the date of the hearing, in May 2011, and that she had been working there full-time since February 2011. She did not testify that she worked in the CRC when she returned to work in the summer of 2010. Where Arms was working in May of 2011 is irrelevant to where she was working in October of 2010, when the events took place that were the subject of the unfair labor practice claim.[2] In short, there is no evidence to support the Board's assertion that Arms "returned" to a job at the CRC in the summer of 2010. To the contrary, the evidence is that she returned to her job as an intake caseworker.

2. The charge of unfair labor practice at issue in this case pertains to what occurred in the fall of 2010. The Board decided that the County's stated concerns about staffing in October 2010 were not valid because of what Arms said about her job in May of 2011, which did not keep her busy on Mondays. Arms has filed a grievance because the County refused her request to work at the CRC on a 4–10 basis.

The majority asserts that because "Arms was transferred from her position as an intake caseworker ... *after* her schedule was changed [this] undercuts the County's assertion that the schedule change was to ensure proper caseworker coverage on Mondays...." Op. at 16, n. 3. The majority infers that because Arms moved to another job in February of 2011, the County did not need five intake caseworkers in October of 2010.

First, Arms herself testified that the County was hiring a new intake caseworker to fill the vacancy created by her transfer to the CRC. N.T. 29; R.R. 23a.

Second, by February of 2011, there may no longer have been a staffing problem on Mondays. This does not mean there was no staffing problem in October of 2010 when the alleged unfair labor practice occurred.

Third, Arms herself may have requested the transfer because an opening developed at the CRC. Openings in government agencies are usually announced so that employees may bid on the position. The majority seems to assume that Arms was a passive participant in the transfer.

In any case, the County's assertion that it needed "proper caseworker coverage on Mondays" is supported throughout the record. Op. at 16, n. 3. To pick two instances: Parish's response to Arms' return to the County in the summer of 2010 was "absolutely" because Arms wanted to work five days, which "helped" the County's "operational issues." N.T. 99; R.R. 41a. Second, the County and the Union agreed, specifically, to modify the 4–10 program for intake caseworkers so that the prison would have coverage on Mondays and Fridays.

Second, Arms herself testified that Parish asked her to take Wednesdays off when she announced her plan to return to the 4–10 schedule. Arms refused. Then Parish, according to Arms, stated that she "had to try." N.T. 21; R.R. 21a. Thereafter, Parish conferred with the Union steward, who recalled that Parish told him that Arms' return to Mondays off "would be an issue" and that the 4–10 schedule "presents a problem for a caseworker to have either Friday or Monday off due to the typical workload on those days." R.R. 87a. Finally, the existence of the modified agreement itself, finalized in May of 2010, to ensure Monday coverage refutes the Board's claim that the County never raised Monday coverage as an issue for intake caseworkers until Arms chose to exercise her 4–10 schedule rights. All this evidence refutes the Board's finding that the County had no concern about Arms not working on Mondays until after she exercised her right to work a 4–10 schedule, choosing Mondays off.

Third, Parish was consistent about the need for five intake caseworkers on Monday. She testified that the County planned to have Arms' replacement work on Mondays, and this new hire would have raised the Monday personnel complement to five. The plan to hire a new caseworker was abandoned when Arms returned, working on Mondays. The Board's finding that the County had all the intake caseworkers it needed on Monday, even without Arms, lacks any foundation in the record.

In sum, the Board's stated reasons for rejecting the County's explanation of its staffing problem are not supported by substantial evidence. The special 4–10 agreement for intake caseworkers negotiated by the County and the Union would not have been necessary if the County did not have an actual staffing problem on Mondays.

The majority observes that this Court must bow to the determination that the County "threatened" Arms because of the Board's expertise in labor law. This expertise is irrelevant to the discernment of a threat. A common definition of a threat is:

> An expression of an intention to inflict evil, injury, or damage on another usu. as retribution or punishment for something done or left undone.

Webster's Third New International Dictionary 2382 (2002). One need not be an expert in labor law to discern the difference between a factual statement and a threat.

Employers are barred from making a "threat of reprisal" towards an employee. *Stairways, Inc.*, 425 A.2d at 1175. In the cases cited by the majority, such as *Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547, and *Stairways, Inc.*, the employers threatened employees with reprisals, such as termination of employment or closing of the employer's business, if the employees exercised their right to engage in protected union activities.[3] These cases are inapposite. The County did not threaten reprisals. The County did not

---

**3.** In *Gissel*, one employer told employees seeking to start a union that if they were caught talking to union representatives, "you God-damned things will go." *Gissel*, 395 U.S. at 580 n. 1, 89 S.Ct. 1918. Another employer handed out pamphlets depicting graves of other companies allegedly put out of business by unions and warning that should the employees choose to unionize, the employer's plant would likely close and the employees would have a difficult time finding reemployment. *Id.* at 588–89, 89 S.Ct. 1918.

In *Stairways, Inc.*, the employer, who was unhappy with an employee's union activities, told him that his job was "on the line and in jeopardy" and shortly thereafter discharged him. *Stairways, Inc.*, 425 A.2d at 1175.

These cases are clearly distinguishable.

even ask Arms to give up her 4–10 schedule; it asked only that she select a day off other than Monday. Likewise, there is no evidence that the County threatened the Union steward.

The County acknowledges that Arms had a right to work a 4–10 schedule with Monday off, and she did so. It did not "force" her to give up that right. Rather, the County approached the Union to see if a schedule change could be negotiated to preserve the program, as the County and the Union had done in May 2010. The 4–10 program was a trial program and the County had a right to end it with 30 days' notice. The statements by Parish and Weaknecht had to be made in order for the County to address its staffing needs for Mondays. Their statements did not express an intention to inflict "injury or damage" as retribution for Arms engaging in protected union activities.

Further, the County did not single out Arms for different treatment. She was on an indefinite leave when the 4–10 program was modified for the intake caseworkers. It was Arms' actions that prompted the County's request that Arms change her schedule to Wednesdays off. Ironically, had the Union agreed to negotiate with the County over the scheduling issues, as it had done before, the result might have been a happy one for all concerned. The 4–10 program may have been modified, for example, to have the affected intake caseworkers rotate the right to take Mondays off.

The Board has concluded, in summary fashion, that the County made a threat and coerced Arms. However, the Board offered no explanation or guidance as to how the County could have otherwise communicated to resolve its staffing problem. The County was placed in a Catch–22. Had the County not spoken to the Union steward about the problem with the 4–10 program, the County would have faced a charge of committing an unfair labor practice. When the County did so speak, it was, in fact, charged with an unfair labor practice. The lesson appears to be (1) never accommodate employees with an alternative work schedule and (2) communicate only in writing, while citing contract provisions in chapter and verse.

The Board offers no more than a subjective test for determining whether an employer has "threatened" or "coerced" its employee, namely the employee's own reaction to the employer's words. However, five different employees hearing the same words from their employer could perceive those words in five different ways. A threat must be evaluated objectively by what a reasonable person would believe. *See, e.g., Aversa v. Unemployment Compensation Board of Review,* 52 A.3d 565 (Pa.Cmwlth.2012) (holding that whether an employee's e-mail issued a threat to a coworker must be evaluated by objective standards). Arms' characterization of a factual statement as threatening is not, itself, evidence of a threat.

The Board has ordered the County to cease and desist from violating the law and to reinstate Arms to her four-day schedule, with Mondays off. The former directive is not an order with any meaning because the County is already under that onus. The real problem with the Board's adjudication is that it provides no guidance to the County on how it could have exercised its constitutional right and managerial prerogative guaranteed under the contract with the Union without committing an unfair labor practice. Such guidance would represent a valid, and expected, exercise of the Board's expertise in labor matters.

In summary, the record does not support the Board's conclusion that the County threatened or coerced Arms because of an anti-union *animus*. A factual statement about the exercise of a contractual right is communication protected under the First Amendment. I would reverse the Board's determination that the County committed an unfair labor practice.

President Judge PELLEGRINI and Judge BROBSON join in this dissent.